# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**AMERICAN TUNABOAT ASSOCIATION**,

    Plaintiff,

    v.

**WILBUR ROSS *et al.*,**

    Defendants.

Case No. 1:19-cv-01011 (TNM)

## MEMORANDUM OPINION

The Endangered Species Act consultation process ensures that federal agencies take no action that would jeopardize the continued existence of endangered or threatened species or adversely affect critical habitat. The Act also grants certain rights for "applicants" to participate in this process. This case is about whether the National Marine Fisheries Service wrongly denied the American Tunaboat Association applicant status regarding the Service's ongoing review of the U.S. purse seine fishery in the Western and Central Pacific Ocean.

The Association sued, claiming the denial was arbitrary and capricious. Both the Association and the Service have moved for summary judgment. For the following reasons, the Court finds that the Service's denial decision was reasonable. So the Association's motion will be denied, and the Service's motion will be granted.

## I.

### A.

The Endangered Species Act ("the Act"), 16 U.S.C. § 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The Service lists species that it

determines are at risk of extinction as endangered or threatened. 16 U.S.C. § 1533; 50 C.F.R.
§ 402.01(b). The Act prohibits federal agencies from taking actions that are likely to jeopardize
these listed species or destroy or adversely modify designated critical habitat. 16 U.S.C.
§ 1536(a)(2). So federal agencies must consult with the Service before taking an action that may
adversely affect these species or their critical habitats. *Id.* [1]

If an agency's action is likely to adversely affect a listed species or critical habitat, the
agency must engage in formal consultation. 50 C.F.R. § 402.14. As part of the formal
consultation process, the Service prepares a biological opinion. *See id.* §§ 402.12(k)(1),
402.14(a)-(b). A biological opinion includes, among other things, the Service's opinion "on
whether the action is likely to jeopardize the continued existence of a listed species or result in
the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h)(3). If the
Service concludes that the action is likely to jeopardize the continued existence of a listed
species, it must offer "reasonable and prudent alternatives" that would not jeopardize the species.
16 U.S.C. § 1536(b)(3)(a); 50 C.F.R. § 402.02.

The Service then prepares an Incidental Take Statement that sets levels for the taking of
the species that will not jeopardize its existence. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).
"Take" means any conduct that could harm, kill, or capture the creature. *See* 16 U.S.C
§ 1532(19).

---

[1] For terrestrial and freshwater fish species, agencies must consult with the U.S. Fish and
Wildlife Service instead. *See* 50 C.F.R. § 402.01(b). Because only marine species are at issue
here, this Opinion focuses on the role of the National Marine Fisheries Service.

The Act provides certain rights for applicants to participate in the consultation process. *See generally* 16 U.S.C. § 1536. The Act does not define "applicant."[2] But 50 C.F.R. § 402.02 does: "any person . . . who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." Applicant status conveys certain valuable rights. Applicants can submit information during the consultation, 50 C.F.R. § 402.14(d); approve agency-requested extensions of time to complete formal consultation, *id.* § 402.14(e); participate in discussions on the Service's review and findings in a biological opinion, including the availability of any reasonable and prudent alternatives, *id.* § 402.14(g)(5); and request a copy of and submit comments on a draft biological opinion, *id.*

## B.

The U.S. purse seine fishery operating in the Western and Central Pacific Ocean ("the Fishery") is a large tuna fishery. A.R. 29. It generally operates in the waters off several Pacific Island states, the high seas, and the U.S. Exclusive Economic Zone surrounding the U.S. Pacific Island territories and possessions. *See* A.R. 26. Several different international treaties and domestic authorities govern the Fishery. *See, e.g.*, the South Pacific Tuna Act of 1998, 16 U.S.C. § 973; the Western and Central Pacific Fisheries Convention Implementation Act, 16 U.S.C. § 6901 *et seq.*; the High Seas Fishing Compliance Act of 1955, 16 U.S.C. § 5501 *et seq.* The Service issues various permits, licenses, endorsements, and other authorizations to allow the Association's members to operate in the Fishery. A.R. 5.

---

[2] The parties agree that the Act's definition of "permit or license applicant," 16 U.S.C. § 1532(12), does not apply here. *See* Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at 6, ECF No. 19-2; Defs.' Cross-Mot. for Summ. J. ("Defs.' Br.") at 3, ECF No. 20-1.

In 2006, the Service completed a consultation for "the continued authorization" of the Fishery under current and proposed regulations.[3] A.R. 22. The biological opinion included an Incidental Take Statement that authorized the annual incidental take of about 60 individual turtles across five different species. A.R. 161. The Service required some "reasonable and prudent measures," as implemented by terms and conditions, mainly focused on sea turtle take mitigation measures. *See*, *e.g.*, A.R. 162–64. These measures became binding when incorporated into regulations issued through notice and comment rulemaking. *See* 50 C.F.R. § 300.223(f); 74 Fed. Reg. 38,544.

Since then, the Service has listed additional species near the Fishery, like the oceanic whitetip shark and the scalloped hammerhead shark, as threatened or endangered. A.R. 493–94. Because of these new listings, the Service reinitiated consultation in October 2014. A.R. 205.[4] The subject of the consultation is "the continued operation of [the Fishery], as currently managed under [the Service's] regulations implementing the South Pacific Tuna Treaty and decisions of the Western and Central Pacific Fisheries Commission." A.R. 495.

South Pacific Tuna Corporation, a member of the Association, first requested applicant status from the Service so that it could participate in this ongoing consultation. A.R. 15–18. The Service denied its request for applicant status but offered to work with the Corporation to develop a framework for its involvement in the consultation. A.R. 8–10. Then, the Association, which represents all U.S. large purse seine vessels participating in the Fishery, requested applicant status. A.R. 5. The Service also denied this request but similarly offered to extend some participation opportunities to the Association without formally designating the Association

---

[3] When engaged in consultation for the Fishery, the Service consults internally. A.R. 205–6.
[4] The Service extended the consultation in December 2017, A.R. 433, and again in May 2018, A.R. 457–58.

an applicant. A.R. 1–3. The denial was transmitted in a formal, three-page letter signed by the Regional Administrator of the Service's Pacific Islands Region Office. *See id.*

The Association filed a Complaint and a Motion for Preliminary Injunction. *See* ECF Nos. 1, 2. The Court heard oral argument on the motion. Afterwards, the Association withdrew its Motion for Preliminary Injunction, and the parties agreed to expedited summary judgment briefing. *See* Joint Motion, ECF No. 15.

## II.

Summary judgment is usually only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56. But when a court is reviewing an administrative agency's decision, the standard set out in Federal Civil Procedure Rule 56 does not apply. *See Richards v. I.N.S.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977). Instead, as both parties acknowledge, courts review an agency's decision under the deferential standard provided in the Administrative Procedure Act. *See Ramaprakash v. Fed. Aviation Admin.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The arbitrary and capricious standard is deferential; it requires that agency action simply be reasonable and reasonably explained." *Comtys. for a Better Env't v. E.P.A.*, 748 F.3d 333, 335 (D.C. Cir. 2014) (cleaned up). An agency action is arbitrary and capricious if an agency fails to "comply with its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. E.P.A.,* 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).

# III.

## A.

The first issue here is whether the Association has standing to sue. "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting U.S. Const. art. III, § 2). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and "[t]he concept of standing is part of this limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (cleaned up). To establish Article III standing, the Association "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Perhaps naturally, the Association argues that it has associational standing. *See generally* Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at 14–23, ECF No. 19-2. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Service does not contest that the Association meets the latter two elements of associational standing. *See generally* Defs.' Cross-Mot. for Summ. J. ("Defs.' Br."), ECF No. 20-1. The Association, an organization dedicated to "a robust, sustainable, fairly managed, and economically strong Fishery," Pl.'s Br. at 15, has an "obvious interest in challenging" the Service's refusal to allow it or its members to participate as applicants in the consultation

6

process.  *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin*., 724 F.3d 243, 247 (D.C. Cir. 2013).  "[C]onsultation is designed as an integral check on federal agency action . . . ."  *Ctr. for Bio. Diversity v. E.P.A.,* 861 F.3d 174, 182 (D.C. Cir. 2017) (cleaned up).  And neither the claim asserted, nor the relief requested, requires any of the Association's members to participate as a named plaintiff in the lawsuit.  *See id.*

The remaining question, then, is whether at least one of Association's members has standing to sue.  *See Am. Trucking Ass'ns, Inc.*, 724 F.3d at 247.  The Association argues that the South Pacific Tuna Corporation, one of its members, has suffered a procedural injury.  Pl.'s Br. at 17.

Courts relax the redressability and imminence requirements for a plaintiff claiming a procedural injury, but "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."  *Summers v. Earth Island Inst*., 555 U.S. 488, 497 (2009).  The Supreme Court "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).

As to injury, the claim that the Service violated its own regulation by denying the Association or its member applicant status describes "archetypal procedural injury."  *See Ctr. for Bio. Diversity,* 861 F.3d at 182.  Procedural injury occurs when an agency fails to follow a legally required procedure and this failure increases the risk of future harm to some party.  *See Spokeo*, 136 S. Ct. at 1549–50.

That is what happened here.  The Service's alleged procedural error—its failure to follow its own regulations as to "applicant"—is a necessary, but not sufficient, requirement for a

procedural-rights plaintiff to establish standing. *See id.* at 664–65. The D.C. Circuit has recently explained, "[f]or a statutory violation to constitute an injury in fact, then, the statute must protect the plaintiff's concrete interest—*i.e.*, afford the putative plaintiff a right to be free of a harm capable of satisfying Article III." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059 (D.C. Cir. 2019).

Here, the consultation process protects the Corporation's concrete interests: compliance costs. *See City of Clarksville v. Fed. Energy Reg. Comm'n,* 888 F.3d 477, 482 (D.C. Cir. 2018) ("This imposition of new regulatory obligations, in and of itself, is sufficient to establish standing."). Regulated entities have concrete interests in both (1) being able to meet their regulatory responsibilities; and (2) in avoiding unwarranted regulatory obligations. *Cf. Chrysler Corp. v. Brown,* 441 U.S. 281, 316 (1979) ("In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment.").

Establishing causation in the context of a procedural injury requires a showing of two causal links: (1) a link connecting the alleged procedural error to some substantive government decision that may have been wrongly decided; and (2) a link connecting that substantive decision to the plaintiff's particularized injury. *See Ctr. for Bio. Diversity*, 861 F.3d at 184. As to the second link, the Association does not have to "establish the merits of its case," *i.e.*, that harm has in fact resulted from the Service's procedural failures. *See id.* Rather, the Association needs only to show that there is a "substantial probability" that the lack of applicant status will harm its member. *See Am. Petroleum Inst. v. E.P.A.*, 216 F.3d 50, 63 (D.C. Cir. 2000).

First, it was the Service's allegedly erroneous interpretation of "applicant" that caused the Service to deny the South Pacific Tuna Corporation's formal request for "applicant" status. And the Corporation has already suffered harm because of the Service's decision. Because of the Service's allegedly unlawful decision, the Corporation has lost some opportunity to influence agency decisionmakers before they commit to a course of action. As other courts have acknowledged, "[i]t is far easier to influence an initial choice than to change a mind already made up." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.).

Consultations are designed to allow applicants to influence the decision-making process. The aim is to make agency decisionmakers aware of applicants' concerns and take them into account. And over time, it becomes harder to influence these decisionmakers. *Cf. Nat'l Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) ("The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal."). In short, the later the access to the agency decisionmakers, the less valuable it is. And the Service has denied this access since October 2014. A.R. 205. Its accommodation of a quick review at the *end* of this process is a meager second best.

Finally, the injury is redressable in this suit. A procedural-rights plaintiff need not show that "court-ordered compliance with the procedure would alter the final [agency decision]." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005). Here, if the Association is correct in its claim, then the Court may order the Service to designate the Corporation as an applicant. *See Fla. Audubon Soc'y*, 94 F.3d at 668 (explaining that procedural violations are often "easily redressable, as a court may order the agency to undertake the procedure."). So the Court finds that the Corporation—and thus the Association—have standing to challenge the Service's decision.

The Service claims that the Association has not shown injury-in-fact because its claims of economic injury are "purely speculative." Defs.' Br. at 18. It argues that the Association "points to nothing in the biological opinion or Section 7(a)(2)/7(d) memoranda that raises the likelihood of a jeopardy opinion, or the imposition of costly measures." *Id.* Not so.

To be sure, the Association hopes that the Service will not raise compliance costs or impose burdensome measures on its members. But the Association's members have already been injured: they have lost—and continue to lose—time and opportunity to influence agency decisionmakers before they commit to a course of action, as discussed above.

For that same reason, the Court rejects the Service's argument that the Association has alleged a "purely procedural injury." *See* Defs.' Br. at 16–17. The Association is not merely complaining that the Service did not follow its own regulations. Its members have suffered real injury because they have been denied access—access that it insists that the Act itself requires—to agency decisionmakers during this consultation process and to the decisionmaking process itself.

The Service also contends that any injury that the Association or its members suffer is "due to its voluntary action of refusing" to engage with the Service. *See* Defs.' Br. at 16. It suggests that the Association "could have avoided its injury simply by accepting [its] offer to share a copy of the draft BiOp for comment." *Id.* at 17.

The Association insists that it should not have to depend on the Service's "bureaucratic benevolence—which could disappear with the political winds." *See* Pl.'s Reply Br. at 13 n.15, ECF No. 22. The Court agrees. The Service can revoke its offer to send the Association its draft biological opinion. It cannot negate the Association's standing to challenge an allegedly unlawful agency act by making a one-time, revocable exception for the Association.

And applicants have other rights, too. They can submit information during the consultation, 50 C.F.R. § 402.14(d); approve agency-requested extensions of time to complete formal consultation, *id.* § 402.14(e); and participate in discussions on the Service's review and findings in a biological opinion, including the availability of any reasonable and prudent alternatives, *id.* § 402.14(g)(5). A complimentary ticket to the cheap seats is a paltry consolation if one had been promised a corporate suite. For all these reasons, the Court holds that the Association has standing.

## B.

The Service next argues that the Association's claim is not ripe. *See* Defs.' Br. at 23–25. It insists that the Association needs to wait until the Service issues its biological opinion because only then will the Court know if the opinion imposes any burdens on the Association. *Id.* at 23. The Association counters that its claim is ripe because its injuries accrued when the Service denied the Association and its member applicant status. Pl.'s Reply Br. at 8.

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 386 (D.C. Cir. 2012). It has both a constitutional and prudential component. *Id.* "Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). So "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.*

Here, the alleged injury is not even imminent; it has already occurred. The Service already denied the Association applicant status, refusing it access to specific information and the opportunity to exchange information with the Service during the decisionmaking process.

As for the prudential component of ripeness, the Court applies a two-part analysis, considering both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 1431. No further factual development is necessary for the Court to review the Association's claims challenging the Service's interpretation of the term "applicant."

True, it is unclear right now what the biological opinion itself will say. But that is not the subject of this lawsuit. This lawsuit is about who qualifies as an applicant. And the Service does not dispute that it made a final agency decision when it denied the Association applicant status. *See generally* Defs.' Br. at 23–25. As for hardship, if the Court does not rule until the Service issues its biological opinion, the Association would have no chance to receive, submit, and exchange information with the Service about the biological opinion.

The Service argues that the Association's claim is not ripe because it has not shown an injury-in-fact and will not suffer hardship from waiting until the Service issues its biological opinion. *See id.* at 23–24. Again, it does not matter what the biological opinion ultimately says: the Corporation has already suffered an injury because it has been denied a right to participate in the consultation process. And this injury grows over time since "[i]t is far easier to influence an initial choice than to change a mind already made up." *Sierra Club*, 872 F.2d at 500.

### C.

Turning to the merits, the issue is whether the Service's decision—denying the Association applicant status—was arbitrary and capricious. Of course, an agency action is arbitrary and capricious if an agency fails to "comply with its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009. According the Association, the Service has done exactly that. Pl.'s Br. at 23.

The Act itself is silent on the definition of an "applicant" in this context. So the Court turns to the regulations. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). The Service's consultation regulations define "applicant" as "any person . . . who requires formal approval or authorization from a Federal agency as a prerequisite for conducting the action." 50 C.F.R. § 402.02. "Action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." *Id.*

When the Service determined that the Association was not an applicant, it explained that it saw "a distinction between individuals participating as Applicants on specific licenses, permits, or authorizations, and individuals or fishing organizations participating during the broad programmatic review of programs that conserve and manage fishery resources." A.R. 2. According to the Service, the Association is not an "applicant" under the Act's definition because the consulted-upon action is "the continued operation" of the entire Fishery. Defs.' Br. at 9. In the Service's view, "applicant status is limited to persons seeking a specific permit that is the subject of the consultation, not a consultation on a regulatory or management program." *Id.* at 29.

In response, the Association argues that the Service's "interpretation of 'applicant' is wholly disconnected from and inconsistent with its regulations." Pl.'s Br. at 24. It insists that its members are persons who require "formal approval or authorization"—permits—"from a Federal agency as a prerequisite for conducting the action"—fishing. *Id.* (citing 50 C.F.R. 402.02).

To begin, the Court must identify the appropriate standard of review to apply to the Service's interpretation of a regulation that it has authored. Courts generally defer to agencies'

reasonable readings of genuinely ambiguous regulations. *See Auer v. Robbins*, 519 U.S. 452 (1997).

The Supreme Court recently clarified the application of *Auer* deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). First, *Auer* deference applies only if a regulation is genuinely ambiguous. *Id.* at 2415. To determine whether a regulation is genuinely ambiguous, courts must exhaust all the "traditional tools" of construction. *Id.* If genuine ambiguity persists, courts will defer to an agency's reading only if it is reasonable. *Id.* at 2415–16. But courts will not defer to every reasonable agency reading of a genuinely ambiguous regulation. *Id.* at 2416. The interpretation must be the agency's "authoritative" or "official position," not an *ad hoc* statement. *Id.* And the interpretation should implicate the agency's substantive expertise. *Id.* at 2417. Last, an agency's reading must reflect its "fair and considered judgment." *Id.*

Applying this framework, the Court first concludes that the regulation's definition of "applicant" is genuinely ambiguous. Section 402.02 defines "applicant" as "any person, as defined by section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action."

But what is "the action?" Is it the action that the person needs a permit to do *or* is it the action that the agency is consulting on? In other words, is it fishing or the continued operation of the Fishery? The regulation's own definition of "action" does not dispel the confusion. It defines "action" broadly as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Clearly, fishing is *an* action that is authorized by federal agencies. But is it *the* action? In short, the regulation's definition of applicant is ambiguous in this circumstance.

Second, the Service's interpretation is reasonable.  Under its view, an applicant is a person seeking, or who has sought, a permit from an agency, and that agency's approval of that permit is the subject of the consultation.  *See* A.R. 2.  Applicant status, thus, is unavailable for programmatic consultations because those consultations relate to broad programs rather than specific permits.  *See id.*

The Service's Handbook defines "programmatic consultation" as a consultation "addressing an agency's multiple actions on a program, regional or other basis."  U.S. Fish and Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* ("the Handbook") (1998), at xvii.  True, the Act itself does not distinguish between programmatic and individual consultations, but the Service's dichotomy here is rationale.

Consider the alternative.  The Association suggests that an applicant in this context is a person who needs a permit to fish.  But everyone, the Court presumes, *needs* a permit to fish lawfully.  The Association's proposed interpretation of "applicant" has no clear limiting principle.  It is certainly reasonable for the Service to require a link between a person's required authorization and the subject of the specific consultation.

The roles and responsibilities of an applicant, as outlined in both the Act and the regulation, confirm the limited scope of "applicant."  For instance, the regulations require the Service to use the applicant in identifying reasonable and prudent alternatives that both the agency and the applicant can take to avoid jeopardizing species. 50 C.F.R. § 402.14(g)(5).  In the context of a permit application for a specific project, the importance of the applicant's expertise is obvious given the applicant's knowledge of its own project.  But for a programmatic

consultation, a lone permitee likely would not have expertise for identifying reasonable and prudent alternatives applicable for an entire regulatory scheme or program.

True, the Association represents all large U.S. flag purse seine vessels in the Fishery, and so it can plausibly claim relevant knowledge in this programmatic review. But the regulations and the Handbook govern all consultations, including programmatic reviews where there is no comparable association and thousands of potential applicants. *See, e.g.*, 82 Fed. Reg. 18,706 (explaining that there are 1,335 limited access permits under the Northeast Multispecies Fisheries Management Plan). Reasonable interpretations of regulations must account for the varied areas in which they apply.

More, both the statute and the regulations require that applicants consent to extensions of the consultation deadline longer than 60 days. *See* 16 U.S.C. § 1536(b)(1)(B); 50 C.F.R. § 402.14(e). This power to consent (or not) to extensions makes sense when there is an individual applicant whose proposed project cannot begin until completion of consultation. But for programmatic consultations with dozens or even thousands of applicants, it is hard to imagine how the Service would manage all the competing interests.

Still more, the preamble to the final rule for the Section 7 regulations ("the Preamble") accords with the Service's position. There, the Service specifically declines to amend the definition of "applicant" to allow participation in consultations about the promulgation of regulations governing permit issuance because an applicant "is involved in the consultation process as a result of a specific permit or license application." 51 Fed. Reg. at 19,930. A permit applicant instead "may provide input regarding its concerns in the Federal agency's rulemaking process through the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*" *Id.* The Preamble thus underscores that "applicant" status is limited to consultations on specific permit or license

applications and unavailable when the agency is consulting on broader regulatory programs, such as the promulgation of regulations about permit issuance.[5]

Both the Association and the Service insist that the Service's Handbook supports their positions. The Handbook explains that the action agency, here the Service, determines applicant status and coordinates with the applicant during the consultation process. Handbook at 2-12, 2-13. It then says:

> Users of public resources (e.g. timber companies harvesting on National Forests) are not parties to programmatic section 7 consultations dealing with an agency's overall management operations, including land management planning and other program level consultations. However, users who are party to a discrete action (i.e., where they are already the successful bidder on a timber sale that becomes the subject of later consultation or reinitiation when a new species is listed or new critical habitat is designated) may participate as applicants in the section 7 process.

Handbook 2-12. The Association argues that the Handbook treats companies with logging authorizations as applicants for later consultations implicating those authorizations. Pl.'s Br. at 39–40. On the other hand, the Service emphasizes that the Handbook explains that these companies are not parties to programmatic consultations dealing with "overall management operations." Defs.' Br. at 28.

While the Handbook is no model of clarity, the Service's gloss is certainly reasonable. The Handbook says that timber companies cannot participate in a programmatic consultation on forestry management, but they may participate on a "discrete action." For instance, they have

---

[5] The Preamble also provides that "[t]he definition in the proposed rule broadly defines 'applicant' as 'any person who requires formal approval or authorization from a Federal agency as a prerequisite to conduct the action.'" 51 Fed. Reg. at 19,930. The Association emphasizes the Preamble's use of the word "broadly," insisting that the Service intended "applicant" to be read broadly. *See* Pl.'s Br. at 24. But the Preamble goes on to explain that by "broadly" it means that "applicant" includes "those seeking permits, licenses, leases, letters of authorization, and any other form of authorization or approval." 51 Fed. Reg. at 19,930.

applicant status when they are already successful bidders on a timber sale that becomes the *subject* of a later consultation. Putting aside the text's confusing parentheticals, the Handbook is drawing a distinction between overall management reviews in the first sentence, in which applicants cannot participate, and reviews of discrete actions in the second sentence, in which they may. Here, the subject of the consultation is not a discrete act: it is the general operations of the Fishery. While the Handbook may be susceptible to other readings, the Service's interpretation is reasonable.

Courts should not reward agencies for drafting deliberately opaque regulations that they can clarify to their advantage in subsequent litigation, but nor should courts demand crystal clarity from bureaucrats who did not anticipate the implications of unintended regulatory nuances. The Service's reading of the Handbook is plausible on its face and consistent with the other available governing documents.

In sum, the Service offers a fair interpretation of a genuinely ambiguous regulation. The Court is careful not to defer to a merely "convenient litigating position" or "*post hoc* rationalization advanced" to "defend past agency action against attack." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012).

In *Hawaii Longline Association v. National Marine Fisheries Service* ("*HLA*"), another court in this District concluded that the Service's interpretation of "applicant" was "a post-hoc rationalization" because it found no evidence that the issue was considered before the litigation. No. 01-CV-00765, 2002 WL 732363, at *6 (D.D.C. April 25, 2002). Not so here. First, the Service offered the same interpretation of "applicant" in its reasoned letter to the Association before litigation began. A.R. 1–3. Similarly, the Service's position matches its (unsuccessful) litigating position in *HLA* in 2002, and it tracks with its Handbook that it issued in 1998. In

short, the Service's interpretation reflects its "fair and considered judgment." *See Kisor*, 139 S. Ct. at 2417.[6]

More still, the Service's interpretation here is the "official position" of the agency. *See Kisor*, 139 S. Ct. at 2416. The Assistant Administrator for the National Oceanic and Atmospheric Administration Fisheries reviewed the Regional Administrator's decision denying the Corporation applicant status. *See* A.R. 10. And the Regional Administrator signed the denial decisions. A.R. 3.

The Service's interpretation also stems from its expertise in both managing fisheries and in administrating the Act and the related treaties. For example, the Service issues regulations to implement and enforce the South Pacific Tuna Treaty. *See* 16 U.S.C. § 973b. Similarly, based on its authority under the Western and Central Pacific Fisheries Convention Implementation Act, the Service is responsible for promulgating regulations to enforce the Western and Central Pacific Fisheries Commission's directives. *See* 16 U.S.C. § 6901 *et seq.*; *see also* 50 C.F.R. § 300 Subpart O. The Service serves an important role in ensuring that the United States meets its obligations under international law. For all these reasons, the Court will defer to the Service's interpretation of its own regulation.

---

[6] The Association suggests that the Service has changed its interpretation of "applicant" during litigation. Pl.'s Reply Br. at 11–12. The Association insists that the Service is engaged in some type of "game playing." *Id.* at 12. Not so. In its briefing here, the Service is merely clarifying why it denied the Association's specific request. At most, the Service is attempting to be more precise. Any daylight between the interpretations is small given that the Association itself admits that its arguments against this so-called new interpretation remain the same. *See* Pl.'s Reply Br. at 12 (explaining that "the same deficiencies identified in the [Service's] old interpretation set forth in its denial decision apply to its new interpretation"). In any event, the Court's focus is on the Service's denial decision itself, not positions taken in litigation.

Given that deference, it follows that the Service's decision was not arbitrary or capricious. The Service provided a reasoned denial decision that explained and applied the relevant law.

Throughout its briefing, the Association urges the Court to follow *HLA*. Pl.'s Br. at 32–33. But as discussed above, the *HLA* court found that the Service had proffered a post-hoc rationalization and, as such, its interpretation of "applicant" was entitled to less deference. 2002 WL 732363, at *7. Not so here. The Court has determined that the Service's interpretation reflects its "fair and considered judgment." *See Kisor*, 139 S. Ct. at 2417. More, the Court disagrees with the *HLA* court's reading of the timber sale example in the Service's Handbook for the reasons discussed above. In any event, that unpublished magistrate judge opinion is not binding here.

Still, the Association contends that the Service's denial decision was arbitrary and capricious because "this Court" already settled the issue in *HLA*. *See* Pl.'s Br. at 37. Not really. In its denial decision, the Service acknowledged *HLA* but—like the Court now—declined to extend it to these facts. *See* A.R. 3.

It is not arbitrary for the Service to continue to grant the Hawaii Longline Association applicant status given the decision in *HLA* or to adhere to its preferred view of applicant status in other cases. *Cf. Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."); *see also In re Exec. Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district." (cleaned up)).

While the denial decision could have given a more detailed explanation for why it believed *HLA* was wrongly decided, its basis for disagreement with that decision is apparent based on the contents of the denial decision. For instance, the Service clearly disagreed with *HLA*'s reading of the Handbook's timber sale example. *Compare* A.R. 2 *with HLA*, 2002 WL 732363, at *8. The "standard of review under the arbitrary and capricious test is only reasonableness, not perfection." *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007).

According to the Association, the Service's interpretation enables it "to categorically deprive the permittees comprising entire industries of their applicant rights in one fell swoop." Pl.'s Br. at 14. But the Court's holding does not sweep so broadly. For example, the Association does not dispute that this consultation is programmatic. *See generally* Pl.'s Br. In a subsequent case, the type of consultation may be in dispute and lead to a different outcome. More, this consultation involves the application of several international treaties as discussed above. They bolster the reasonableness of a programmatic approach that may be inappropriate elsewhere. Setting aside future hypotheticals, the Court finds that this denial decision was not arbitrary and capricious.

And the Association still has a voice. The Service has offered to develop a framework to allow the Association to participate in the consultation process, even without the applicant designation. *See* A.R. 3. For example, it may review and submit comments on the draft biological opinion before it is final. And the Association can participate in the notice and comment rulemaking process about the management program that is the subject of this consultation. *See* 51 Fed. Reg. at 19, 930. Any new terms or conditions in the biological opinion will not be binding on the Association's members until after the notice and comment

rulemaking process. *Id.* In the future, under the National Environmental Policy Act, the Association can submit public comments on the draft Environmental Impact Statement for the Fishery. *See* A.R. 2. To be sure, these opportunities are not equivalent to those granted to applicants under the Act, but they are a reasonable balancing of the Service's interest in receiving input from regulated parties and the need to enforce the Act in an efficient and effective way.

## IV.

For all these reasons, the Plaintiff's Motion will be denied, and the Defendants' Motion will be granted. A separate order will issue.

Dated: July 31, 2019
                                             _____
                                             TREVOR N. McFADDEN, U.S.D.J.